IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Knoxville December 18, 2013

**HERSCHEL V. LILLARD, JR. v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2003-D-3151   Seth W. Norman, Judge**

**No. M2013-01406-CCA-R3-PC - Filed February 20, 2014**

The Petitioner, Herschel V. Lillard, Jr., appeals the Davidson County Criminal Court's denial of his petition for post-conviction relief from his 2010 conviction for first degree felony murder and resulting life sentence.  The Petitioner contends that the trial court erred by denying him relief because he received the ineffective assistance of counsel.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROGER A. PAGE, JJ., joined.

Ryan C. Caldwell, Nashville, Tennessee, for the appellant, Herschel V. Lillard, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Caitlin E.D. Smith, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Dan Hamm, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from the 2003 shooting death of Justin Green during a home invasion for which the Petitioner was convicted.  The Petitioner appealed his conviction, and this court affirmed the conviction and summarized the facts of the case as follows:

> According to the State's proof at trial, on August 5, 2003, the defendant and three accomplices traveled to a home located on Mill Station Drive in Nashville. Two of the men entered the home, pointed weapons at its residents, and demanded money. During the incident, one of the residents, fifteen-year-old Justin Green, was shot and killed.  The defendant was subsequently

indicted for first degree felony murder based on his participation in the killing of the victim during the perpetration of or attempt to perpetrate a robbery.

At trial, the victim's mother, Mary Jane Crockett Green, testified that at about 9:00 p.m. on the night of the shooting, her dog's "vicious" growling and barking roused her from bed. When she got up, she saw a man standing just outside the doorway to her room with a gun "pressed into" the victim's chest. Ms. Green then heard gunshots in another part of the house, and "everybody ran." After the shots, she saw another man run across the living room and out of the house. She described the first man, whom she had never seen before, as "really distinctive looking, . . . easily recognizable, . . . [and] really, really tall," with braided hair. The second man, whom she also did not recognize, stood "a lot" shorter than the first and wore a bandanna around his face. After the men left, Ms. Green found the victim lying facedown in his room.

Chris Crockett, the victim's brother, testified that he had become friends with the defendant while the two worked together at a restaurant in downtown Nashville. Around the time of the shooting, he had received a settlement of approximately $10,000 as part of a personal injury claim, and he had stored the funds, in cash, in a box in the living room of the house. Crockett testified that he told everyone that worked at the restaurant with him, including the defendant, about the money he had received. He also testified that he periodically sold marijuana to the defendant from the Mill Station home and that the defendant had visited him there to purchase marijuana earlier on the day that the victim was shot.

Crockett testified that on the night of the shooting, he was playing video games with the victim when he looked up to see a man holding a gun in his face. The man holding the gun asked him where the money was, and he responded by walking the man toward the box where he had stored the cash. As he neared the box, his mother emerged from her bedroom and began screaming, and one of the armed men ran toward the victim's room. Immediately afterwards, Crockett heard gunfire. Crockett testified that in the ensuing commotion, he collided with the second armed man, wrestled the man's gun away from him, and attempted to fire it. The weapon would not fire, however, so he retrieved his own weapon from a bedroom and shot at the two men as they fled. Crockett testified that he did not recognize either gunman.

-2-

Detective Joe Williams of the Metropolitan Nashville Police Department, who was assigned to the homicide unit at the time of the shooting, testified that he attended the victim's autopsy and received from the medical examiner the bullet that had been removed from his body.

Sergeant Daniel Orr of the Metropolitan Nashville Police Department Crime Scene Unit described the bullets, spent shell casings, bullet holes, and weapons that he found at the scene of the shooting, including a nine-millimeter semi-automatic handgun that was introduced as Exhibit 6.

Officer Carlos Anderson of the Metro Nashville Police Department testified that he was the first officer to respond to the scene of the shooting. The victim was breathing shallowly when he arrived, and he radioed for an ambulance and attempted CPR. Another officer arrived shortly thereafter, and the two of them secured the scene while waiting for the homicide unit and the ID section of the crime scene unit. On cross-examination, Officer Anderson testified that the victim's brother, Chris Crockett, told him at the scene that three people had invaded the home that night.

Dr. Bruce Levy, the medical examiner for Davidson County, testified that the victim died from "a single gunshot wound to the right upper-side of his chest," with the bullet striking "his right lung, his heart, his left lung, his liver, and his stomach."

Special Agent Steve Scott of the Tennessee Bureau of Investigation, an expert in firearms identification, testified that the bullet removed from the victim's body had been fired from the nine-millimeter semi-automatic handgun, previously identified as Exhibit 6.

The State's final witness was Homicide Detective Robert Anderson of the Metropolitan Nashville Police Department who testified that, during the course of his investigation, he learned that a man named Phillip Lillard had been admitted to the emergency room at a local hospital for treatment of a gunshot wound, and he went to interview him there. He said that Lillard admitted that he had gone to the Mill Station home where he had been shot. Lillard also told him that the defendant had accompanied him to the house.

Detective Anderson testified that the defendant surrendered himself to the police after a warrant had been issued for his arrest. He identified a video recording of his interview with the defendant, which was introduced into

evidence. During the interview, the defendant initially claimed that he and three others, including the two men who entered Crockett's residence, had driven there to buy marijuana. He later admitted, however, that he knew that the men intended to rob Crockett and that he had directed them to Crockett's home and allowed them to use his car. The defendant further admitted that he had not wanted to enter the house because he knew that Crockett could identify him. The defendant said that, after the shooting, he threw one of the other men's guns in a dumpster. Throughout the interview, the defendant insisted that he neither needed money nor expected to profit from the robbery.

The defendant elected not to testify and presented no evidence in his defense.

*State v. Herschel Van Lillard, Jr.*, M2010-00869-CCA-R3-CD, slip op. at 1-3 (Tenn. Crim. App. Aug. 19, 2011), *perm. app. denied* (Tenn. Nov. 15, 2011). The Petitioner now seeks post-conviction relief.

At the post-conviction hearing, the Petitioner testified that he met with counsel three or four times before the trial. He said that he was released on bond two years after his arrest and that after his release, he only met with counsel at the courthouse. He said that counsel provided the State's discovery package and that they discussed the charges against him, the possible outcome of a trial, and the possible punishments. He agreed he understood the information they discussed.

The Petitioner testified that the State offered twenty-five years for second degree murder but that counsel did not discuss "percentage or nothing." He said counsel did not hire an investigator. He wanted counsel to have his statement to the police suppressed because he was under the influence of alcohol and marijuana and said he told the police "anything that . . . could get [him] out of the situation." He denied that counsel filed a suppression motion and said that counsel told him the statement could not be suppressed because he made it voluntarily. He said that he learned a warrant for his arrest existed, that he turned himself in to the police, and that the interview began twenty minutes later. He said that before he turned himself in to the police, he was with his mother, stepfather, wife, and children and that he did what he always did, "get high and drink." He said that he smoked one-quarter of an ounce of marijuana, which was seven or eight "blunts," and that he smoked his last blunt twenty or thirty minutes before the interview. When asked to describe his mental state, he said he was "very high," thought his judgment was clouded, and was unable to think coherently.

-4-

The Petitioner testified that his mother saw his photograph on the news and told him to turn himself in to the police. He told his mother that he wanted to finish smoking marijuana and drinking before going to the police station and that he would report to the police station the following day. He said that his mother threatened to take him to the police station and that he agreed to turn himself in to the police that day. He said he signed a form at the police station but denied knowing if it was a waiver of rights form. He knew he was in police custody but did not recall telling the detective he was under the influence of drugs. He said, though, that he remembered telling the detective he did not know what was going on. He said he viewed the recorded interview for the first time during the trial. He said counsel told him that he viewed the recording before the trial.

The Petitioner testified that he told counsel he was under the influence of drugs and alcohol during his police interview but could not recall when he told him. He believed he told counsel around the time counsel successfully argued to reduce his bond. He said that counsel did not think the trial court would reduce his bond and that he threatened to obtain another attorney who would argue to reduce his bond if counsel refused to file the motion. He said he was released two weeks later and did not mention the police interview again until the start of the second trial. He said the first trial resulted in a hung jury. He said he attempted to call counsel after he was released on bond but was unable to speak with him.

The Petitioner testified that counsel did not interview his family. He said he was at a hotel with his wife and two children before his mother took him to the police station. He denied that his wife used drugs.

The Petitioner testified that counsel explained the benefits and pitfalls of testifying at the trial and that he signed a waiver of his right to testify. He said that although he thought it was a good idea to tell the jury his version of the events, counsel told him that in criminal cases, it was best not to testify. He said he had two previous convictions for driving without a license.

On cross-examination, the Petitioner testified that counsel's representation in this case lasted about seven years and that he had several court appearances because he had three codefendants. He said that had he testified at the trial, he would have said he was at the scene with "a couple older guys, who . . . influenced me to go." He said that the men were about three or four years older and that he was nineteen years old at the time of the shooting. He identified one of his codefendants as his cousin Phillip Lillard, who unduly influenced him, and said Ben Dickens, another codefendant who unduly influenced him, was a family friend for about five or six years. He said codefendant Lillard was twenty-two years old at the time of the shooting. He said Arnold Foster, the third codefendant, was a family friend and was younger than he.

The Petitioner testified that he would have told the jury that he had smoked marijuana daily since he was twelve years old. He said that in the beginning, he did not know the other men were going to rob the victim who died, who was his friend. He said that he and his codefendants were going to buy more marijuana but that codefendant Dickens mentioned robbing the victims instead. He agreed he did not enter the victims' house because the victims knew the Petitioner. He denied wanting to rob the victims and denied recalling who provided directions to the victims' house. He said that had he testified, he would have told the jury that he and his codefendants went to the victims' home to buy drugs but that his codefendants decided to rob the victims instead. He said that he knew codefendants Dickens and Lillard had guns that night because they always carried guns. He agreed, though, he told the police that he and his codefendants initially went to the victims' home to buy drugs. He agreed that he told the police that he did not kill or rob anyone and did not want to rob or kill anyone. He said that he wanted to testify but that he relied on counsel's knowledge of the law in deciding not to testify. He agreed he "signed off" on not testifying and was sober when he made his decision.

The Petitioner testified that although he was under the influence of drugs at the time he gave his statement, he walked without assistance and spoke coherently. He agreed that the police obtained a warrant for his arrest before he turned himself in to the police and that the police placed him and his car at the scene.

On redirect examination, the Petitioner testified that he told the police that he told his codefendants to go the victims' house and that he threw one of the guns used in the offenses in the trash. He said that had he been in his "right mind," he would not have provided a statement to the police. He stated that he did not want to talk to the police but that his parents thought it was best he make a statement because he did not kill anyone.

Shauna Lillard, the Petitioner's wife, testified that she was present when the Petitioner turned himself in to the police. She said that earlier that day, she and the Petitioner smoked marijuana and drank in their hotel room. Although she did not recall the exact amount, she said they smoked a lot. She said their two young sons were also in the hotel room. She said that the Petitioner's mother called, wanting him to turn himself in to the police, that the Petitioner agreed, and that his mother picked him up at the hotel. She said the Petitioner drank from the early afternoon until his mother arrived. She thought they drank gin.

Ms. Lillard testified that she attempted to talk to counsel, that she left numerous voicemail messages asking counsel to call her, and that counsel did not return her calls. She said counsel's wife answered the telephone once. She said counsel did not interview her or ask about the facts of the case.

-6-

On cross-examination, Ms. Lillard testified that they lived in the hotel room at the time of the Petitioner's arrest. She said that the Petitioner smoked marijuana on the night of the shooting and that she remembered because it was someone's birthday. She agreed she was not present when the Petitioner gave his statement to the police and did not view the recording of the interview during the trial. She said that although she did not talk much to counsel about the Petitioner's case, she did not know much. She learned from the detective that the Petitioner was involved in a robbery that went wrong, that the Petitioner did not enter the house, and that two of the Petitioner's friends went into the house. She said the Petitioner only told her that codefendant Lillard was shot.

Caroline Newby, the Petitioner's mother, testified that she was present when the Petitioner was booked. She saw the Petitioner on the news and convinced him to turn himself in to the police. She and her husband picked up the Petitioner at a hotel on Trinity Lane around 7:00 or 8:00 p.m. She said the Petitioner's eyes were red when she arrived. She said that when she spoke to the Petitioner on the telephone, he told her to hurry because he was paranoid the police were going to find him. She said that when they arrived at the police station, the Petitioner was "a little jittery . . . like when you get high." She said he smelled of marijuana.

Ms. Newby testified that she spoke to counsel on the telephone about court dates but that it was difficult to contact him. She denied that they spoke about what occurred the day she took the Petitioner to the police station and that counsel asked her for information. She said she wrote counsel notes during the trial, requesting he ask specific questions. She agreed counsel knew her contact information.

On cross-examination, Ms. Newby testified that she did not know information about the shooting. She said, though, the Petitioner stated that he and his codefendants were going to buy marijuana but that codefendants Lillard and Dickens decided to rob the victims. She said the Petitioner denied wanting to rob the victims. She agreed no one forced the Petitioner to associate with the codefendants. She admitted telling the Petitioner that she did not like codefendant Lillard and that she did not like the Petitioner's spending time with him.

Counsel testified that he had practiced law for twenty-seven years. He stated that the State's discovery package included the "whole file" and that he shared the information with the Petitioner. He did not know if the Petitioner shared the discovery with his family but said he did not provide it to them. He agreed the Petitioner gave a statement to the police and said he first viewed the recorded statement in the prosecutor's office. He said that he understood the Petitioner during the statement and that nothing led him to believe the statement was subject to suppression based on the Petitioner's being intoxicated. He agreed the proof showed that the Petitioner and his car were at the scene, although he did not enter the

victims' house. He agreed that the Petitioner's car was used to transport codefendant Lillard to the hospital and that codefendant Lillard's blood was found inside the car.

Counsel testified that in the Petitioner's statement to the police, the Petitioner first denied knowing his codefendants were going to commit a robbery but that the Petitioner later said he knew but did not want to participate. He agreed he hoped the jury would conclude that the Petitioner did not have anything to do with the homicide and that his participation in the robbery was minimal. He said at least one juror agreed with this theory based on the first jury's inability to reach a verdict.

Counsel testified that during the second trial, the State offered twenty-five years subject to the family's approval. He agreed the State's theory of felony murder was not that the Petitioner was the "triggerman." He said the Petitioner never mentioned that he had been drinking or smoking marijuana the night he gave his statement to the police. He said that he had no difficulty understanding the Petitioner during his recorded statement to the police. He did not recall the Petitioner's falling asleep or showing signs of fatigue during the interview. He said that based on his experience as a criminal defense attorney, it was normal for someone facing a first degree murder charge to be nervous and paranoid.

Counsel testified that he and the Petitioner met a few times at the courthouse and discussed the status of his and the codefendants' cases. He agreed the Petitioner's trial was the last of all the defendants because the Petitioner was released on bond and his codefendants were in custody pending trial. He agreed he observed the codefendants' court proceedings. He said that the Petitioner's trials went as expected, that there were no surprises, and that the State presented the same evidence in the Petitioner's and the codefendants' trials. He agreed codefendant Foster pleaded guilty before the Petitioner's trial and said codefendant Foster would have testified against the Petitioner had the State asked. He agreed the State did not present codefendant Foster at the Petitioner's second trial.

Counsel testified that he and the Petitioner discussed whether the Petitioner should testify at the trial, that he advised the Petitioner against testifying, that he advised the decision was the Petitioner's, and that he told the Petitioner the trial court would tell him the decision was his. He said the Petitioner never stated that he was drunk and high when he turned himself in to the police. He said the Petitioner told him the same version of events regarding the robbery and shooting to which the Petitioner testified at the post-conviction hearing.

On cross-examination, counsel testified that he did not recall if the Petitioner's car was seized by the police and agreed that no blood evidence from the car was admitted during the Petitioner's trial. He agreed the primary evidence against the Petitioner was his statement

to the police. He said he did not interview the witnesses who testified at the post-conviction hearing before the trial to determine what happened the day the Petitioner reported to the police. He agreed the State did not threaten to revoke any plea offers if the Petitioner sought to suppress the statement to the police and said the only offer was made during the second trial. He said that he watched the recorded statement several times looking for a basis to suppress the statement but that he did not find one. He agreed that intoxication would have been a basis to suppress the statement if intoxication could have been corroborated by the Petitioner's actions, tone, or appearance during the interview.

Counsel testified that none of the Petitioner's family told him the Petitioner was intoxicated at the time he provided his statement. He said the family members called him several times. He denied discussing the Petitioner's case with his family.

The trial court denied post-conviction relief. Regarding the claim that counsel deprived the Petitioner of his right to testify, the court found that the Petitioner testified at the hearing that although he wanted to testify, he agreed it was "probably a better idea to refrain" from testifying "in light of the potential pitfalls[.]" Regarding the claim that counsel failed to interview and call witnesses at the trial, the court found that none of the witnesses who testified at the post-conviction hearing would have changed the outcome of the trial. Regarding counsel's failure to meet with the Petitioner adequately, the court credited counsel's testimony that they met "quite a few times" at the courthouse and found that the Petitioner's case was docketed frequently because the case involved three codefendants.

The trial court found that counsel was unaware that the Petitioner claimed to have been under the influence of alcohol and marijuana when he made his statement and that counsel "could not be faulted with the failure to move for . . . suppression." The court noted the Petitioner's alleged daily use of marijuana and stated that it would have been "somewhat difficult" to obtain a statement from the Petitioner when he was not under the influence. After reviewing the recorded interview, the court found that it was "evident . . . that the Petitioner was able to understand his rights and proceed to make a coherent statement." The court found that even if counsel had known of the alleged intoxication and filed a motion to suppress the statement, the motion would not have been successful. This appeal followed.

The burden in a post-conviction proceeding is on the petitioner to prove his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2012). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. *Id.* at 457.

Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2012).

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the Petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance fell below a reasonable standard is not enough because the petitioner must also show that but for the substandard performance, there is "a reasonable probability that . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

The Petitioner contends that the trial court erred by finding that he received the effective assistance of counsel. He argues that counsel provided ineffective assistance by failing to file a motion to suppress his pretrial statement to the police on the ground that he was intoxicated. The State responds that counsel was not deficient and that the Petitioner failed to establish prejudice. We conclude that the Petitioner is not entitled to relief.

The record shows that counsel reviewed the recorded interview several times looking for grounds to suppress the statement but did not find a basis for suppressing the statement. Counsel had no difficulty understanding the Petitioner during the interview and saw no external signs of intoxication such as fatigue, drowsiness, or slurred speech. Neither the Petitioner nor his family told counsel of the Petitioner's daily drug use or alcohol consumption on the night he made his pretrial statement.

The trial court reviewed the recorded interview and concluded that it was "evident . . . that the Petitioner was able to understand his rights and proceed to make a coherent statement." The recorded interview shows that the Petitioner walked into the interview room unassisted and without stumbling. The Petitioner was advised of his rights and provided a statement. His speech was clear and coherent, and he answered the detective's questions regarding the shooting. The Petitioner showed no signs of fatigue or drowsiness during the interview. At no time during the interview did the Petitioner appear to be under the influence of alcohol or drugs. We cannot conclude that counsel was deficient by failing to file a motion to suppress the statement. The Petitioner is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE